**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------X
REGINA LAMB-AMATO,

|  |  |
|---|---|
| Plaintiff, | Case No. |
|  | **COMPLAINT** |
| -against- | **JURY TRIAL DEMANDED** |
| ABBOTT HOUSE, LUIS RODRIGUEZ, MOITRI N. DATTA, DORIS LAURENCEAU, JAMES L. KAUFMAN, and JEFF SHAPIRO, |  |
| Defendants. |  |

-------------------------------------------------------------------X

Plaintiff REGINA LAMB-AMATO ("Plaintiff"), by and through her attorneys, The Siegel Law Firm, P.C., hereby alleges as follows:

## JURISDICTION AND VENUE

1.     This court has jurisdiction over the subject matter of this action: (i) pursuant to 31 U.S.C. §3732, which confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §3730; (ii) pursuant to 28 U.S.C. §1331, which confers federal subject matter jurisdiction.  The Court also has supplemental jurisdiction over state and city law claims under 28 U.S.C. §1367.

2.     Venue is appropriate in this District pursuant to 31 U.S.C. § 3732(a) because one or more of the defendants can be found and transacts business in this District, and/or acts proscribed by 31 U.S.C. § 3730 occurred in this District.  Venue is also appropriate in this District pursuant to 28 U.S.C. § 1391(c) because this Court has personal jurisdiction over the Defendants with respect to this action.

## THE PARTIES

3.     Plaintiff is a resident of New York.

4.     Upon information and belief, Defendant ABBOTT HOUSE ("Abbot House") is a

domestic not-for-profit corporation with its principal place of business located at 100 North Broadway, Irvington, New York 10533.

5.      Upon information and belief, in or about 2013, Abbott House entered into an agreement with the United States Department of Health and Human Services, Office of Refugee Resettlement for funding of Abbott House programs for unaccompanied migrant children.

6.      Upon information and belief, Defendant LUIS RODRIGUEZ ("Rodriguez"), is a resident of New York, and at all relevant times, was a physician and the Senior Vice-President and Medical Director at Abbott House, and was a manager, with full managerial authority over Abbott House employees.  At all relevant times, Rodriguez met the definition of an "employer" under the New York Labor Laws, General Business Laws, and is jointly and severally liable with all Defendants.  At all relevant times Rodriguez was a direct supervisor of Plaintiff.

7.      Upon information and belief, MOITRI N. DATTA ("Datta") is a resident of New York and is a physician, and the Medical Director of Abbott House, and is a manager, with full managerial authority over Abbott House employees.  At all relevant times, Rodriguez met the definition of an "employer" under the New York Labor Laws, General Business Laws, and is jointly and severally liable with all Defendants.  At all relevant times Rodriguez was a direct supervisor of Plaintiff.

8.      Upon information and belief, Defendant DORIS LAURENCEAU ("Laurenceau") is a resident of New York and is a Social Worker, and the Program Director of Abbott House, and is a manager, with full managerial authority over Abbott House employees.  At all relevant times, Rodriguez met the definition of an "employer" under the New York Labor Laws, General Business Laws, and is jointly and severally liable with all Defendants.  At all relevant times Rodriguez was a direct supervisor of Plaintiff.

9.      Upon information and belief, Defendant James L. Kaufman ("Kaufman") is a resident of New York and is a Social Worker, and the President and CEO of Abbott House, and is a manager, with full managerial authority over Abbott House employees.  At all relevant times, Kaufman met the definition of an "employer" under the New York Labor Laws, General Business Laws, and is jointly and severally liable with all Defendants.  At all relevant times Kaufman was a direct supervisor of Plaintiff.

10.      Upon information and belief, Defendant JEFF SHAPIRO ("Shapiro") is a resident of New York and is the Vice President of Residential and Group Home Services, and is a manager, with full managerial authority over Abbott House employees.  At all relevant times, Shapiro met the definition of an "employer" under the New York Labor Laws, General Business Laws, and is jointly and severally liable with all Defendants.  At all relevant times Shapiro was a direct supervisor of Plaintiff

11.      At all times herein mentioned, Abbot House had more than four employees and is a covered employer under the New York State Human Rights Law ("NYSHRL"), and Plaintiff is a covered employee under the NYSHRL.

## **FACTUAL BACKGROUND**

Fraudulent Use and Alteration of Prescription Pads

12.      Plaintiff is a physician, who practices in the field of pediatric medicine.

13.      Plaintiff began working for Abbott House on or about May 1, 2017 as a pediatrician.

14.      During the term of her employment with Abbott House, Plaintiff earned an annual salary of approximately $139,000.00.

15.     Shortly after commencing her employment with Defendant, Plaintiff became aware that Rodriguez, one of Plaintiff's supervisors, and at least one other Abbott House employee who, upon information and belief, is not a licensed physician in the United States, utilized the prescription pads of other physicians to write unauthorized prescriptions to patients of Abbott House.

16.     Plaintiff objected to the practice of Rodriguez utilizing other physician's prescriptions pads, refused Rodriguez's requests to permit him to utilize Plaintiff's prescription pads to write prescriptions under Plaintiff's name, and made complaints to Abbott House and Abbot House's agents and/or employees in connection with said practice.

17.     New York Penal Law section 170.10(5) provides that a person is guilty of forgery in the second degree when, with intent to defraud, deceive or injury another, he falsely makes, completes or alters a written instrument which is or purports to be, or which is calculated to become or to represent if completed, a prescription of a duly licensed physician or other person authorized to issue the same for any drug or any instrument or device used in the taking or administering of drugs for which a prescription is required by law.

18.     Plaintiff opposed Rodriguez's practice of utilizing other physician's prescription pads, *inter alia*, due to New York Penal Law section 170.10(5).

19.     Rodriguez's practices created a significant hazard to the patients at Abbott House and constituted improper quality of patient care or improper quality of workplace safety.

20.     Plaintiff believed such practices to constitute fraud.

21.     Plaintiff raised the issue of Rodriguez's improper utilization of prescription pads with Abbott House and Abbott House's agents, including supervisors, and her concerns were ignored.

22.     Plaintiff afforded Abbott House a reasonable opportunity to correct the activity, policy, or practice, yet Abbott House failed to take any corrective activity, policy, or practice.

23.     Instead of remediating the unsafe conditions, Abbott House retaliated against Plaintiff, culminating in the termination of her employment.

24.     As a direct and proximate result of Plaintiff's complaints about the fraudulent and unauthorized use of prescription pads by Rodriguez, Plaintiff was retaliated against, including but not limited to harassment, bullying, and ultimately termination of her employment on or about February 6, 2020.

Improper Alterations of Medical Charts

25.     Upon information and belief, Abbott House receives funding from the United States Government in connection with the medical treatment of migrants.

26.     As a condition of receiving funding from the United States government, Abbott House is subject to audits of their medical care and records.

27.     In order to maintain the funding from the United States government, Abbott House, and their agents and/or employees have engaged in practices to fraudulently alter the medical charts of patients to reflect that Abbott House maintains patient care charts and electronic medical records to artificially achieve higher audit scores, to maintain funding under its contracts with the US Government and/or to secure additional or expanded funding by the United States Government.  Alteration of patient medical charts was even performed by Abbott House employees that were not physicians, such as by Laurenceau.

28.     Upon information and belief, if Abbott House did not engage in the practice of altering medical charts, it would adversely affect the requisite United States government audits,

impacting funding received by the United States government, and/or negatively impact United States government contracts.

29.     Plaintiff's medical charts for patients were altered without her authorization or consent for the purposes of obtaining favorable Audits.

30.     Abbott House defrauded the United States government, as Abbott House continued to receive full funding from the United States government by fraudulently obtaining perfect Audit scores through the unauthorized alterations of patient medical charts.

31.     Had Abbott House not altered the medical charts of patients, their perfect Audits would not have been as favorable, and they would not have received the funding provided for by the United States government.

32.     Plaintiff opposed Defendants' practice of altering patient medical charts, insisted that such conduct was unlawful and should be stopped, and provided Defendants with time to cease the unlawful conduct, but no measures were undertaken to remediate the matter.

33.     Defendants' practices created a significant hazard to the patients at Abbott House and constituted improper quality of patient care or improper quality of workplace safety.

34.     During the term of her employment, Plaintiff learned that Rodriguez was not testing patients for Tuberculosis, and was instead fraudulently representing that Tuberculosis tests were administered, and misrepresenting that the test results were negative for Tuberculosis.

35.     Plaintiff made complaints to Defendants, provided Defendants with time to cease the unlawful conduct, but no measures were undertaken to remediate the matter.

36.     Instead of taking efforts to resolve the problem of unauthorized alterations of patient medical charts, Abbott House retaliated against Plaintiff, which culminated in Plaintiff's employment being terminated.

37.     Plaintiff opposed Defendants' practice of falsifying Tuberculosis testing, insisted that such conduct was unlawful and should be stopped, and provided Defendants with time to cease the unlawful conduct, but no measures were undertaken to remediate the matter.

38.     Plaintiff complained that Defendant refused to give appropriate medical care to refugee children as determined and prescribed by Plaintiff in accordance with Defendants' contracts with the United States government.

39.     Additionally, Defendants' practices created a significant hazard to the patients at Abbott House, and the general public, and constituted improper quality of patient care or improper quality of workplace safety.

Discrimination and Hostile Work Environment

40.     During the course of her employment with Abbott House, Plaintiff was subject to discrimination, harassment and a hostile work environment, based upon her membership in the protected groups of religion, sex, and disability.  Namely, Plaintiff was treated differently and worse than other employees because she is a white, Jewish woman, who suffers from ADHD.

41.     For example, on multiple occasions, Laurenceau, one of Plaintiff's supervisors, a social worker and Program Director at Abbott House, called Plaintiff a JAP (a derogatory acronym for Jewish American Princess), as well as a "chica blanca" a derogatory phrase equivalent to "white chick".

42.     Anthony Micelli, another Abbott House employee also called Plaintiff a JAP, and he would at times spread peanut butter directly into Plaintiff's hair, and throw chairs toward Plaintiff.

43.     Anthony Micelli further made derogatory remarks concerning women, and Plaintiff during periods of time when Plaintiff would bring female patients into Abbott House,

complaining that he would be stuck late at work because Plaintiff was encouraging "vagina

hour".

44.     Rodriguez engaged in frequent angry tirades and acts of intimidation against

Plaintiff.

45.     Laurenceau, Rodriguez, and Anthony Micelli, also routinely joked about

Plaintiff's disability, including stockpiling psychotropic medications, and teasing her that she

should take medication from the pile of psychotropic drugs.

46.     Plaintiff complained to management and Human Resources about such

discriminatory and harassing conduct.

47.     Defendant failed to investigate or take remedial measures, but permitted and

condoned such unlawful conduct.

48.     As a result of Plaintiff's protected complaints, she suffered adverse actions,

including her termination

49.     The harassing, discriminatory, and retaliatory conduct and hostile work

environment continued until Plaintiff was terminated by Defendant on or about April 28, 2020.

### AS AND FOR A FIRST CAUSE OF ACTION
### (False Claims Act, 31 U.S.C. §3730(h) – Retaliatory Termination)

50.     Plaintiff repeats and re-alleges each and every allegation contained in paragraphs

"1" through "49" as if fully set forth herein.

51.     Plaintiff made protected complaints to Defendants in connection with improper

patient care and its impact on the Audit reports.

52.     Plaintiff specifically complained about patient medical charts being altered in

order for Abbott House to pass Audits necessary to continue receiving funding from the United

States Government, in furtherance of a False Claims Act action.

53.     Additionally, Plaintiff made specific complaints that Defendants refused to give appropriate medical care to refugee children as determined and prescribed by Plaintiff in accordance with Defendants' contracts with the United States government, in furtherance of a False Claims Act action.

54.     Defendants retaliated against Plaintiff by harassing her, bullying her, and terminating her employment after Plaintiff objected to, and made complaints about, the misrepresented quality of care, medical records and charts of Abbott House Patients.

55.     The conduct for which Defendant retaliated against Plaintiff was protected conduct under the False Claims Act.

56.     Defendant terminated Plaintiff because of her protected activity.

57.     Defendant is liable to Plaintiff for damages as a result of her wrongful termination for her protected activity

**AS AND FOR A SECOND CAUSE OF ACTION**
**(Discrimination in Violation of the New York State Human Rights Law – All Defendants)**

58.     Plaintiff repeats and re-alleges each and every allegation contained in paragraphs "1" through "57" as if fully set forth herein.

59.     Plaintiff was employed by Defendants.

60.     Plaintiff was a member of protected groups based upon her race, sex, religion, and/or disability.

61.     By the actions described above in detail, Defendants engaged in a pattern and practice of harassment and discrimination against Plaintiff with respect to the terms, conditions and privileges of employment, and treating her less favorably because of her race, sex, religion, and/or disability.

62.     Plaintiff was treated differently and worse than other similarly situated employees, based upon her membership in one or more of her protected groups.

63.     As part of their pattern and practice of employment discrimination, Defendants treated Plaintiff in a manner indicative of discrimination based upon her race, sex, religion, and/or her disability.

64.     Defendants knew or should have known about the aforesaid discrimination in the workplace.

65.     Defendants failed and refused to take appropriate action to end the discriminatory treatment and conditions which Plaintiff was subjected to, which was clearly motivated by discrimination based upon race, sex, religion, and/or disability.

66.     Because of the discriminatory acts of Defendants, Plaintiff has suffered, and continues to suffer, harm, including but not limited to emotional distress, for which she is entitled to an award of monetary damages and other relief.

67.     Defendants acted in an outrageous and systematic pattern of oppression and bad faith, directed at Plaintiff.

68.     Because of the acts of Defendants, Plaintiff suffered emotional distress, humiliation, and embarrassment, and Plaintiff has been denied employment opportunities providing substantial compensation and benefits, including but not limited to, loss of past and future income, monetary and/or economic damages, and/or non-monetary damages, entitling Plaintiff to an award of damages.

## AS AND FOR A THIRD CAUSE OF ACTION
### (Violation of New York City Human Rights Law – Title 8 of New York City Administrative Code)

69.     Plaintiff repeats and re-alleges each and every allegation contained in paragraphs "1" through "68" as if fully set forth herein.

70.     Plaintiff was a member of protected groups based upon her race, sex, religion, and/or disability.

71.     Defendant was aware, or should have been aware, of Plaintiff's membership in protected groups.

72.     Defendant discriminated against Plaintiff in the terms, conditions, and/or privileges of her employment.

73.     Plaintiff was treated differently by Defendant and Defendant's agents and/or employees, and Plaintiff suffered negative work consequences, because of her membership in protected groups.

74.     Defendant knew or should have known about the aforesaid discrimination in the workplace.

75.     Defendants failed and refused to take appropriate action to end the discriminatory treatment and conditions which Plaintiff was subjected to, which was clearly motivated by discrimination based upon race, sex, religion, and/or disability.

76.     Because of the discriminatory acts of Defendant, Plaintiff has suffered, and continues to suffer, harm, including but not limited to emotional distress, for which she is entitled to an award of monetary damages and other relief.

77.     Defendant acted in an outrageous and systematic pattern of oppression and bad faith, directed at Plaintiff.

78.     Because of the acts of Defendant, Plaintiff suffered emotional distress, humiliation, and embarrassment, and Plaintiff has been denied employment opportunities providing substantial compensation and benefits, including but not limited to, loss of past and future income, monetary and/or economic damages, and/or non-monetary damages, entitling Plaintiff to an award of damages.

79.     Pursuant to New York City Administrative Code §8-502(g), the court may award the prevailing party reasonable attorney's fees, expert fees and other costs.

### AS AND FOR A FOURTH CAUSE OF ACTION
**(Hostile Work Environment in Violation of the New York Human Rights Law)**

80.     Plaintiff repeats and re-alleges each and every allegation contained in paragraphs "1" through "79" as if fully set forth herein.

81.     At all relevant times herein, Defendant had at least four persons in their employ, and therefore Defendant was and is required to comply with the New York Human Rights Law, including N.Y. Executive Law 296.

82.     N.Y. Executive Law 296(1)(a) prohibits employers from discharging from employment or discriminating against an employee in compensation or in terms, conditions or privileges of employment, because of, *inter alia*, age, race, color, national origin, sex.

83.     Plaintiff was a member of protected groups based upon her race, sex, religion, and/or disability.

84.     Defendant engaged in various severe and hostile actions toward Plaintiff as a result of her status in protected groups of race, sex, religion, and/or disability.  Defendants violated N.Y. Executive Laws 296(1)(a) and 296(6) by discharging Plaintiff and discriminating against her in the terms, conditions, and privileges of Plaintiffs' employment through the creation and maintenance of a hostile work environment.

85.    The hostile work environment was created and fostered through pervasive and regular remarks, slurs, curses, denigration, and other comments made by employees and/or agents of Defendant, regarding Plaintiff.   Enduring Defendant's offensive conduct became a condition of Plaintiff's continued employment.

86.    Defendant's conduct was severe or pervasive enough to create a work environment that a reasonable person would consider intimidating, hostile, or abusive.

87.    Because of the acts of Defendant, Plaintiff suffered emotional distress, humiliation, and embarrassment, and Plaintiff has been denied employment opportunities providing substantial compensation and benefits, including but not limited to, loss of past and future income, monetary and/or economic damages, and/or non-monetary damages, entitling Plaintiff to an award of damages.

88.    Said discrimination occurred with malice and reckless disregard of Plaintiff's rights.

89.    As a direct and proximate result of said discrimination, Plaintiff suffered, and continues to suffer, actual damages, including without limitation, loss of past and future income, mental anguish, and pain and suffering.

90.    Under the New York State Human Rights Law, N.Y. Exec. Law §297.10, Plaintiff is entitled to recover reasonable attorneys' fees and costs of this action.

### AS AND FOR A FIFTH CAUSE OF ACTION
**(Retaliation in Violation of New York Labor Law §740)**

91.    Plaintiff repeats, reiterates, and re-alleges Paragraphs "1" through "90" of the Verified Complaint as if fully set forth herein.

92.    At all relevant times, Plaintiff was an "Employee" as defined by New York Labor Law §740(1)(a).

93.     At all relevant times, Defendants were an "Employer" as defined by New York Labor Law §740(1)(b).

94.     Plaintiff made numerous complaints to Defendant and/or Defendant's supervisors in connection with the activities, policies, and practices of Defendants, that were in violation of law, rule or regulation, which violation created and presented a substantial and specific danger to the public health or safety, or which constituted health care fraud.

95.     Plaintiff objected to, and/or refused to participate in an activity, policy, or practice that constituted a violation of a law, rule or regulation.

96.     Plaintiff objected to and refused to participate in any activity, policy or practice of Defendant or Defendant's agents, that presented a substantial and specific danger to the public health or safety.

97.     Specifically, Plaintiff refused to permit others to utilize her prescription pads for the purposes of writing unauthorized prescriptions to patients that Plaintiff had not treated. Plaintiff also brought to the attention of her supervisors and managers issues concerning the practice of unauthorized use of prescription pads, and objected to and/or refused to participate in such activities, policies, or practices. Plaintiff also objected to and made complaints about the unauthorized alteration of patient medical charts and objected to and made complaints about Defendants' falsifications of Tuberculosis testing.

98.     Defendants refused to give appropriate medical care to refugee children as determined and prescribed by Plaintiff in accordance with Defendants' contract with the United States government.

99.     As a direct and proximate result of Plaintiff making complaints, and/or objecting to, and/or refusing to participate in the aforesaid activities, policies, or practices concerning the

violations of laws, rules, and/or regulations which created and presented a substantial and specific danger to public health or safety, or which constituted health care fraud, Plaintiff was retaliated against by Defendant, including but not limited to harassment, bullying, and ultimately termination of her employment.

## AS AND FOR A SIXTH CAUSE OF ACTION
### (Retaliation in Violation of New York Labor Law §741)

100.    Plaintiff repeats, reiterates, and re-alleges Paragraphs "1" through "99" of the Verified Complaint as if fully set forth herein.

101.    At all relevant times, Plaintiff was an "Employee" as defined by New York Labor Law §741(1)(a).

102.    At all relevant times, Defendant was an "Employer" as defined by New York Labor Law §741(1)(b).

103.    Plaintiff made numerous complaints to Defendant and/or Defendant's supervisors in connection with the activities, policies, and practices of Abbott House, which Plaintiff, in good faith, reasonably believed constituted improper quality of patient care or improper quality of workplace safety.

104.    Specifically, Plaintiff refused to permit others to utilize her prescription pads for the purposes of writing unauthorized prescriptions to patients that Plaintiff had not treated. Plaintiff also brought to the attention of her supervisors and managers issues concerning the practice of unauthorized use of prescription pads, and objected to and/or refused to participate in such activities, policies, or practices. Plaintiff also objected to and made complaints about the unauthorized alteration of patient medical charts and objected to and made complaints about the Defendants' falsifying Tuberculosis testing.

105.    Defendants refused to give appropriate medical care to refugee children as determined by Plaintiff in accordance with Defendants' contract with the United States government.

106.    Plaintiff objected to and refused to participate in any activity, policy or practice of Defendant or Defendant's agents, that Plaintiff, in good faith, reasonably believed constituted improper quality of patient care or improper quality of workplace safety.

107.    Plaintiff brought the issues concerning improper quality of patient care or improper quality of workplace safety to the attention of her supervisors and managers.

108.    Plaintiff afforded Defendant a reasonable opportunity to correct the activities, policies, or practices.

109.    After being afforded a reasonable opportunity to correct the activities, policies, or practices, Defendant failed to take any corrective measures.

110.    As a direct and proximate result of Plaintiff making complaints concerning the improper quality of patient care and improper quality of workplace safety, Plaintiff was retaliated against by Defendant, including but not limited to harassment, bullying, and ultimately termination of her employment.

## AS AND FOR A SEVENTH CAUSE OF ACTION
### (Counsel Fees)

111.    Plaintiff repeats, reiterate, and re-allege Paragraphs "1" through "110" of the Verified Complaint as if fully set forth herein.

112.    Pursuant to New York Labor Law §740(5)(e), the court may order the payment by the employer of reasonable costs, disbursements, and attorney's fees.

113.    Pursuant to N.Y. Exec. Law §297(10), an employer may be liable for attorneys' fees for having committed an unlawful discriminatory practice.

114.     Pursuant to New York City Administrative Code §8-502(g), the court may award the prevailing party reasonable attorney's fees, expert fees and other costs.

115.     Based upon Defendants' violation of the New York Labor Laws, and New York Human Rights Laws, Plaintiff is entitled to counsel fees in an amount to be determined at trial, but in no event less than $15,000.00.

## PRAYER FOR RELIEF

**WHEREFORE,** the Plaintiffs pray for judgment as follows:

(a) On Plaintiff's First Cause of Action, judgment awarding Plaintiff an amount to be determined at trial, but in no event less than $550,000.00;

(b) On Plaintiff's Second Cause of Action, judgment awarding Plaintiff an amount to be determined at trial, but in no event less than $550,000.00;

(c) On Plaintiff's Third Cause of Action, judgment awarding Plaintiff an amount to be determined at trial, but in no event less than $550,000.00;

(d) On Plaintiff's Fourth Cause of Action, judgment awarding Plaintiff an amount to be determined at trial, but in no event less than $550,000.00;

(e) On Plaintiff's Fifth Cause of Action, judgment awarding Plaintiff an amount to be determined at trial, but in no event less than $550,000.00;

(f) On Plaintiff's Sixth Cause of Action, judgment awarding Plaintiff an amount to be determined at trial, but in no event less than $550,000.00;

(g) On Plaintiff's Seventh Cause of Action, Judgment awarding Plaintiff counsel fees in an amount to be determined at trial, but in no event less than $15,000.00;

(h) Costs and disbursements of this action; and

(i) Such other and further relief as this Court deems just and proper.

Dated: April 28, 2021
      Garden City, New York

/s *Bradley R. Siegel*
By : Bradley R. Siegel, Esq.
THE SIEGEL LAW FIRM, P.C.
*Attorneys for Plaintiff*
591 Stewart Avenue, Suite 400
Garden City, NY 11530
(516) 558-7559